SCHAFFER FAMILY INVESTORS, §    CASE NO. *082242-F*
LLC, a Delaware limited liability §
company; and ROBERT SCHAFFER, §
an individual, §
                              §
**VERSUS**                         §    **16th JUDICIAL DISTRICT COURT**
                              §
**The ESTATE of KRIS MELANCON;** §
**PARKER YELVERTON, as** §
**Administrator of the Succession of Kris** §    **ST. MARTIN PARISH, LOUISIANA**
**Melancon; PINNACLE OIL & GAS,** §
**LLC, a Louisiana limited liability** §
**company; LEMEL PETROLEUM,** §
**LLC, a Louisiana limited liability** §
**company** §

FAX FILED
ON: 1/14/15

---

### PETITION FOR DAMAGES

    NOW INTO COURT, through undersigned counsel, come Plaintiffs Schaffer Family

Investors, LLC ("SFI") and Robert Schaffer ("Schaffer") (collectively, "Plaintiffs") and allege as

follows:

1.

    Venue is proper pursuant to Louisiana Code of Civil Procedure article 81.

2.

    SFI is a limited liability company organized and existing under the laws of the State of

Delaware with its principal place of business in the County of Los Angeles, State of California

3.

    Schaffer is an individual residing in the County of Los Angeles, State of California.

4.

    Based on information and belief, Plaintiffs allege that defendant Kris Melancon

("Melancon") is an individual who resided in the State of Louisiana. Upon information and

belief, Melancon died on Friday, November 13, 2013, and a succession proceeding has been

opened (and remains open), styled as *Succession of Kris Manuel Melancon,* Case No. 15483,

16th Judicial District Court, St. Martin Parish, Louisiana.

5.

    Based on information and belief, Plaintiffs allege that Parker Yelverton is the

administrator and representative of the Succession of Kris Melancon.

EXHIBIT
A
IN GLOBO

6.

Plaintiffs are informed and believe, and based thereon allege, that defendant Pinnacle Oil & Gas, LLC ("Pinnacle") is a limited liability company organized and existing under the laws of the State of Louisiana with its principal place of business in Lafayette, Louisiana.

7.

Plaintiffs are informed and believe, and based thereon allege, that defendant Lemel Petroleum, LLC ("Lemel") is a limited liability company organized and existing under the laws of the State of Louisiana with its principal place of business in Lafayette, Louisiana.

8.

Plaintiffs are without information as to the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sue those defendants by such fictitious names.  Plaintiffs will amend the petition to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that the losses sustained by Plaintiffs as herein alleged were proximately caused by the conduct of such defendants. Melancon, Pinnacle, Lemel, and Does 1 through 10, inclusive, shall be collectively referred to herein as "Defendants."

9.

At all times mentioned herein, each of the Defendants was the agent, partner, servant, employee, and joint venturer of each of the other Defendants, and the principal, partner and/or employer of Lee Sonnier ("Sonnier"), and each such Defendant was acting within the purpose, course, and scope of said agency, employment, or joint venture with the consent, knowledge, and ratification of each of the other Defendants.  As a result, each of the Defendants are liable as a matter of law for the actions and conduct of their respective agent, partner, servant, principal, employee, and/or joint venture.

**FACTUAL BACKGROUND**

10.

This lawsuit arises out of Defendants' sale to Plaintiffs of oil, gas, and mineral royalty and leasehold interests (the "OGM Royalty Interests") in the States of Louisiana, Mississippi, Oklahoma, and other states.  As alleged more fully herein, Defendants induced Plaintiffs to make purchases of the OGM Royalty Interests by misrepresentations made to Plaintiffs through

(i) e-mails sent directly to SFI,

(ii) e-mails sent to Defendants' agent, Sonnier, with the understanding and intent that those e-mails, or the information contained therein, be forwarded to Plaintiffs, and

2

(iii) on information and belief, information provided to Defendants' agent, Sonnier, in telephone calls, with the understanding and intent that such information be provided to Plaintiffs.

A.   **Purchases of OGM Royalty Interests by Schaffer.**

11.

Beginning in July 2008 and continuing through May 2012, Schaffer paid the Defendants approximately $5,843,725.60 (including $513,000 in purchases made along with SFI) to purchase the OGM Royalty Interests identified in detail in the chart attached hereto as Exhibit A and incorporated by reference as though fully set forth herein.  Schaffer purchased each OGM Royalty Interest by accepting written offers presented to him by Defendants' agent, Sonnier.

12.

In or about September 2007, Schaffer met Sonnier through a mutual friend, Don Elster, who had made prior investments with and through Sonnier.  At a meeting soon afterwards among Schaffer, Elster, and Sonnier, Sonnier stated that: (a) he was a retired attorney who came from a family of extensive wealth; (b) he was interested and active in various investment and business activities; (c) years earlier he had been a participant in an investment group comprised of engineers, accountants, investors, and other attorneys; and (d) such group had successfully invested in various deals throughout the years.

13.

In or about July 2008, Sonnier contacted Schaffer to solicit Schaffer to purchase, through Sonnier as Schaffer's agent, OGM Royalty Interests that had been acquired or were to be acquired by the Defendants, with Sonnier and Melancon also purchasing such OGM Royalty Interests for their own account (or their family members' account).  At such time, Sonnier stated, and Schaffer understood, that Sonnier would invest in OGM Royalty Interests to buy and then resell quickly such interests for lucrative profits.  Sonnier offered to share this opportunity with Schaffer to participate in such venture if Schaffer forwarded funds within a day or so.  (Sonnier made such proposal contemporaneously to Elster.)

14.

Sonnier represented to Schaffer that he had a very close connection with Melancon (and that Sonnier's father and Melancon's father had done similar business activities together) and that Melancon was a highly experienced landman (a person negotiating and acquiring oil, gas, and mineral royalty and leasehold interests from landowners or from other holders of such rights) located in Lafayette, Louisiana who was in the business of investing for his own account in, and buying, selling, and raising money from various investors to purchase, oil, gas, and mineral royalty and leasehold interests.  Sonnier further represented that Melancon had extensive contacts and relationships in the oil and gas business with special knowledge of: (a) the future

3

drilling and production plans of major oil and gas operators; and (b) the plans of other participants in the business of investing, buying, and selling OGM Royalty Interests.

15.

Sonnier further induced Schaffer to purchase OGM Royalty Interests by claiming that, along with Melancon, Sonnier had invested, and would continue to invest, his personal funds and/or his immediate family's funds into OGM Royalty Interests being acquired by Melancon and his companies.  Sonnier offered Schaffer to co-invest in the same OGM Royalty Interests and in the same amount in which Sonnier, and/or his immediate family, would be investing and told Schaffer that Melancon would be investing in the same OGM Royalty Interests in an amount equal to what both Schaffer and Sonnier were investing so that Schaffer would acquire one-fourth of such purported OGM Royalty Interests, Sonnier would acquire another one-fourth of such purported OGM Royalty Interests, and Melancon would acquire the remaining one-half of such purported OGM Royalty Interests.

16.

Based on representations made by Sonnier, Schaffer entered into a verbal agency agreement for Sonnier to serve as Schaffer's agent to evaluate, recommend, acquire, verify, and administer on Schaffer's behalf the same OGM Royalty Interests being purchased by Melancon and Sonnier as offered by the Defendants.

17.

Upon information and belief, the Defendants had actual knowledge that: (a) they were contracting with a principal, Schaffer; and (b) they would be transacting business with Schaffer through Sonnier, who was simultaneously serving as Schaffer's agent and, unbeknownst to Schaffer, as the Defendants' agent.  All of Schaffer's purchases were based upon invoices sent by Sonnier to Schaffer seeking payment to the Defendants, and Schaffer made almost all of the payments directly to the Defendants.

18.

Sonnier, acting also as a sales agent for the Defendants, and acting within the scope of his agency relationship with the Defendants, represented to Schaffer that:

(a)     the purchase price to be paid by Schaffer for any OGM Royalty Interests purchased from the Defendants would be (i) the actual purchase cost paid by the Defendants (with regard to Schaffer's purchases of OGM Royalty Interests prior to his purchase of the interests along with SFI) or (ii) the actual purchase cost paid by the Defendants plus three percent (3%) (with regard to Schaffer's purchases of OGM Royalty Interests along with SFI), and that the Defendants (and Sonnier) were purchasing OGM Royalty Interests, on the same

NO BMB1 584385 v2
2932057-000001 01/14/2015

basis as Schaffer, at industry players' wholesale prices negotiated by Melancon through his long-term experience in the business;

(b)     Sonnier and the Defendants (or their related entities or family members) would each acquire for their own respective accounts at least an equal interest in, and invest at least an equal amount of money in, any OGM Royalty Interests to be acquired by Schaffer, so that any OGM Royalty Interests in properties as to which Schaffer purchased OGM Royalty Interests (with the exception of the third "flip property," discussed below) would be as follows: whatever amount was invested by Schaffer, Sonnier would likewise invest, and Melancon would invest an amount equal to what both Schaffer and Sonnier invested, and each OGM Royalty Interests was to be held in each purchaser's separate legal name as an undivided interest (with the exception of the "flip properties," discussed below);

(c)     with the exception of the three percent (3%) mark-up charged by the Defendants on the later purchase of OGM Royalty Interests (made with SFI), there would be no other financial benefit to Schaffer, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring OGM Royalty Interests on more favorable terms as a result of making combined purchases;

(d)     the OGM Royalty Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the interests were sometimes invoiced with the locations to be provided at a later date); and

(e)     the term of the OGM Royalty Interests in Louisiana would be 10 years (i.e., the lease would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for OGM Royalty Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

19.

Sonnier also sent Schaffer what purported to be forwarded e-mails from Melancon offering OGM Royalty Interests, in which the price per royalty acre stated in the e-mail was increased so as to falsely represent that the price being offered to Schaffer was the price paid by Melancon and to indicate that Sonnier was purchasing an equal share of the OGM Royalty OGM Royalty Interests.

20.

Schaffer paid the prices set forth in the e-mails that Sonnier purported to forward from Melancon, not knowing that the prices quoted by Melancon were marked up from Melancon's

5

actual purchase cost. Schaffer relied upon, *inter alia*, Defendants' representations that Sonnier and the Defendants would be investing their own personal money, or the money of related persons or entities, on the same basis and in at least the same amounts as set forth above and at the same cost-basis price as Schaffer.

21.

Based upon those representations and Sonnier acting as Schaffer's advisor, agent, and confidant, Schaffer relied upon Defendants' representations concerning the merits and value of each proposed investment in an OGM Royalty Interests. From July 2008 through about August 2012, Sonnier spent many hundreds of hours working with Schaffer describing the economic viability, benefits, and legal aspects of the purchases of OGM Royalty Interests that Defendants suggested that Schaffer make, as co-investments with Defendants.

22.

Schaffer paid the prices provided not knowing that the prices had been inflated and marked-up over and above the Defendants' actual purchase cost. As a result of Defendants' representations, Schaffer paid the Defendants approximately $5,843,725.60 (including $513,000 in purchases made along with SFI) to purchase the OGM Royalty Interests identified in detail in the chart attached hereto as Exhibit A and incorporated by reference as though fully set forth herein. However, the Defendants retained a portion of the monies paid by Schaffer that was sufficient to cover the costs they paid to acquire the OGM Royalty OGM Royalty Interests sold to Schaffer, along with a profit on the sale of such OGM Royalty Interests. The Defendants thereafter: (a) paid Sonnier a substantial proportion of the monies received from Schaffer as a "finder's fee," generally paid out of the Defendants' share of the payments made by Schaffer; and (b) paid a larger proportion of the monies received from Schaffer (generally paid from the monies paid by Schaffer as a result of Sonnier's mark-up of the price that the Defendants said they would charge for the OGM Royalty Interests) to an inactive Louisiana corporation named Media/Right Properties, Ltd. ("Media/Right"), a corporation of which Sonnier is the sole officer, according to the Louisiana Secretary of State's website, based, according to the Defendants, upon Sonnier's representations to them that Schaffer was receiving the payments being made to Media/Right. Had Schaffer known that Sonnier, contrary to Sonnier's false representations that Sonnier was receiving no financial benefit from Schaffer's purchases of OGM Royalty Interests, was actually receiving millions of dollars in "finder's fees" and payments to Sonnier through Media/Right out of the monies that Schaffer was paying to purchase OGM Royalty Interests, Schaffer would not have purchased such OGM Royalty Interests.

6

B.     **Purchases of OGM Royalty Interests by SFI.**

23.

Beginning in February 2012 and continuing through August 13, 2012, SFI paid the Defendants approximately $2,101,400 to purchase the OGM Royalty Interests identified in detail in the chart attached hereto as Exhibit B and incorporated by reference as though fully set forth herein. (Schaffer, as an individual, purchased OGM Royalty Interests in 11 of the properties in which SFI purchased OGM Royalty Interests at a cost to Schaffer of approximately $513,000.) SFI purchased each OGM Royalty Interests by accepting written offers presented to it by Sonnier.

24.

Schaffer introduced Sonnier to Schaffer's father, Herbert Schaffer, SFI's representative.

25.

Based on representations made by Sonnier, including Sonnier's representations that he is an attorney licensed to practice law and concerning his experience, knowledge, and personal investments with regard to OGM Royalty Interests, as well as Sonnier's representation that he would be purchasing for his own account the same OGM Royalty Interests as SFI and in the same amounts and that Melancon would be investing an amount equal to what Schaffer, SFI, and Sonnier combined would be investing in each OGM Royalty Interests, SFI entered into a verbal agency agreement for Sonnier to serve as SFI's agent to evaluate, recommend, acquire, verify, and administer on SFI's behalf OGM Royalty Interests being offered by the Defendants.

26.

SFI's purchases of OGM Royalty Interests were arranged with the Defendants by Sonnier. The Defendants had actual knowledge that: (a) they were contracting with a principal, SFI; and (b) they would be transacting business with SFI through Sonnier, who was simultaneously serving as SFI's agent. All of SFI's purchases were based upon invoices sent by Sonnier to SFI seeking payment to the Melancon parties, and SFI made all payments directly to the Melancon parties.

27.

Sonnier, acting also as a sales agent for the Defendants, and acting within the scope of his agency relationship with the Defendants, represented to SFI in or about February 2012 (when Sonnier told SFI that it would be purchasing OGM Royalty Interests on the same terms represented by Sonnier to Schaffer in and after July 2008, as alleged above) and at various times thereafter, including in the July and August 2012 e-mails described below, that:

(a)     the purchase price to be paid by SFI for any OGM Royalty Interests purchased from the Defendants would be the actual purchase cost paid by the Defendants plus three percent

7

(3%), and that the Defendants (and Sonnier) were purchasing OGM Royalty Interests, on the same basis as SFI and Schaffer, at industry players' wholesale prices negotiated by Melancon through his long-term experience in the business;

(b)     Sonnier (or his family members) would each acquire for his own respective account at least an equal interest in, and invest at least an equal amount of money in, any OGM Royalty Interests to be acquired by SFI and Schaffer, and Melancon (or his related entities or family members) and parties related to him, would be acquiring and investing in the same OGM Royalty Interests in an amount equal to what SFI, Schaffer, and Sonnier collectively invested, so that any OGM Royalty Interests in properties as to which SFI and Schaffer purchased would be owned approximately one-fourth by SFI and Schaffer combined (of which approximately 80% would generally be taken by SFI and approximately 20% would generally be taken by Schaffer), one-fourth by Sonnier, and one-half by the Melancon Defendants, and each purchased interest was to be held in each purchaser's separate legal name as an undivided interest;

(c)     with the exception of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests, there would be no other financial benefit to Schaffer, SFI, Sonnier, or Melancon, except for the benefit, shared jointly, of acquiring OGM Royalty Interests on more favorable terms as a result of making combined purchases;

(d)     the OGM Royalty Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the OGM Royalty Interests were sometimes invoiced with the locations to be provided at a later date); and

(e)     the term of the OGM Royalty Interests in Louisiana would be 10 years (i.e., the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for OGM Royalty Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

28.

Sonnier also sent SFI what purported to be forwarded e-mails from Melancon offering OGM Royalty Interests, in which the price per royalty acre stated in the e-mail was increased so as to falsely represent that the price being offered to SFI was the price paid by Melancon and to indicate that Sonnier was purchasing an equal share of the OGM Royalty Interests.

29.

SFI paid the prices set forth in the e-mails that Sonnier purported to forward from Melancon, not knowing that the prices quoted by Melancon were marked up from Melancon's

8

actual purchase cost. SFI relied upon, *inter alia*, Defendants' representations that Sonnier and the Defendants would be investing their own personal money, or the money of related persons or entities, on the basis and in at least the same amounts as set forth above. Based upon those representations and Sonnier acting as SFI's advisor and agent, SFI relied upon Defendants' representations concerning the merits and value of each proposed investment in an OGM Royalty Interests. During 2012, Sonnier spent perhaps 80 hours working with SFI describing the economic viability, benefits, and legal aspects of the purchases of OGM Royalty Interests that Defendants suggested that SFI make, as co-investments with Defendants.

30.

As a result of Defendants' representations, SFI paid the Defendants approximately $2,101,400 to purchase the OGM Royalty Interests identified in detail in the chart attached hereto as Exhibit B and incorporated by reference as though fully set forth herein. However, the Defendants retained a portion of the monies paid by SFI that was sufficient to cover the costs they paid to acquire the OGM Royalty Interests sold to SFI, along with a profit on the sale of such OGM Royalty Interests. The Defendants thereafter: (a) paid Sonnier a substantial proportion of the monies received from SFI as a "finder's fee," generally paid out of the Defendants' share of the payments made by SFI; and (b) paid a larger proportion of the monies received from SFI (generally paid from the monies paid by SFI as a result of Sonnier's mark-up of the price that the Defendants said they would charge for the OGM Royalty Interests) to Sonnier through his company Media/Right, based, according to the Defendants, upon Sonnier's representations to them that Schaffer was receiving the payments being made to Media/Right. Had SFI known that Sonnier, contrary to Sonnier's false representations that Sonnier was receiving no financial benefit from SFI's purchases of OGM Royalty Interests, was actually receiving hundreds of thousands of dollars in "finder's fees" and payments to Sonnier through Media/Right out of the monies that SFI was paying to purchase OGM Royalty Interests, SFI would not have purchased such OGM Royalty Interests.

**C.    The Falsity of Defendants' Representations.**

31.

Based on Defendants' representations, Plaintiffs did not conduct any independent due diligence, and they reasonably relied upon the due diligence to be conducted by Sonnier as their agent and as their putative joint venturer, and upon the due diligence to be conducted by the Defendants as their putative joint venturers.

9

32.

On July 31, 2012 at 7:29 p.m., Herb Schaffer of SFI sent an e-mail to Sonnier asking him, *inter alia*, to confirm the terms of the arrangement by which Plaintiffs were purchasing OGM Royalty Interests.  Sonnier and Melancon confirmed such terms as follows:

     (a)    In an e-mail sent by Sonnier at 7:57 p.m. on July 31, 2012, Sonnier stated that "Kris buys an amount equal to mind [sic] and you plus Bob" and that "[t]he total we buy does include small fee for Kris."

     (b)    In an e-mail sent by Sonnier at 8:07 p.m. on July 31, 2012, Sonnier stated, "I am a buyer and that is all I do[.]  I do not have any financial benefit from kris are [sic] anyone else I purchase minerals from."

     (c)    In an e-mail sent by Melancon on August 6, 2012, Melancon stated, "I am writing this email to you to assure you that my companies, Pinnacle Oil & Gas, L.L.C. and Lemel Petroleum, L.L.C. have retained interests in all of the Royalty & Mineral Prospects that you have purchased interests in.  I have been in the royalty business for over 12 years (have been a Petroleum Landman for over 28 years) and have always retained interests in prospects that I purchase royalty/mineral interests in . . . ."

33.

On August 13, 2012, Herb Schaffer of SFI sent a letter to Melancon spelling out SFI's understanding of the terms of the arrangement by which Plaintiffs had purchased OGM Royalty Interests and asking Melancon to confirm those terms.  In an e-mail sent by Melancon on August 24, 2012, Melancon responded: (i) "be assured that me, my companies and many of my other investors and/or partners own and will own a sizeable amount of [OGM Royalty Interests] in the same prospects that you are buying interests in"; (ii) "be assured that no payments will ever be made to Bob [Schaffer] or Lee [Sonnier] out of any of the payments received from you or Schaffer Family Investors"; and (iii) "be assured that the asking price for interests offered for sale to Schaffer Family Investors will be at cost, plus a profit margin of 3% of the total costs encountered by me and my companies."

34.

In July 2012, Schaffer engaged John G. Miller, Certified Professional Landman of Oil Land Services, Inc. of Lafayette, Louisiana, and Randy Loewen, Esq. of Lafayette, Louisiana, to confirm the value of the properties that Plaintiffs had purchased from Defendants, and to confirm that Defendants had in fact co-invested in the investments presented to and invested in by Plaintiffs.  During this time, SFI continued to purchase OGM Royalty Interests from Defendants through August 13, 2012.

10

35.

In or about late September or early October 2012, Mr. Miller reported that, *inter alia*:

(a) Sonnier had not individually purchased any OGM Royalty Interests in the properties as to which Plaintiffs had purchased OGM Royalty Interests;

(b) the Defendants had retained only minor portions of the OGM Royalty Interests in only a small portion of the properties as to which Plaintiffs had purchased OGM Royalty Interests; and

(c) the OGM Royalty Interests purchased by Plaintiffs at prices generally in excess of $3,000 per royalty acre were generally valued in the range of less than $1,000 per royalty acre at about the time of purchase.

36.

Mr. Miller also reported that the limited number of landowners whom he had been able to contact told him that they had sold OGM Royalty Interests to the Defendants for $625 to $1,200 per royalty acre (as opposed to the approximately $3,000 or more per royalty acre paid directly by Plaintiffs to the Defendants for the same OGM Royalty Interests).

37.

In order to gain further confirmation as to the representations made by Defendants to Plaintiffs, Plaintiffs engaged a special investigator. Posing as a prospective customer to invest with the Defendants, the private investigator on March 12, 2013 sent an e-mail to Sonnier stating his interest in purchasing OGM Royalty Interests in the same manner that Plaintiffs had purchased OGM Royalty Interests from Defendants. In that e-mail to Sonnier, the private investigator stated, among other things:

> Your [Sonnier's] and Chris' [*sic*] [Melancon's] knowledge, expertise, connections and experience as well as your legal background and close long term working relationship with Chris [*sic*], is very reassuring to me. Further, as I understand based upon Herb and Bob's prior purchases, the purchases are made based upon Chris' [*sic*] judgment, connections and expertise, and that Chris [*sic*] purchases large blocks of acres to procure wholesale pricing in the path of development on behalf of a group of participants that includes you and Chris [*sic*], and with your helpful analysis and explanation of each deal submitted by Chris [*sic*], each participant will get assigned it's [*sic*] mineral rights on an equitable basis in their mineral or royalty acres with a 10 year term, unless specified otherwise. Most importantly for me, I understand that I will be purchasing the royalties at Chris' [*sic*] purchase cost plus a 3% administrative fee just as previously sold to you, Herb and Bob. This understanding, along with you and Chris [*sic*] continuing to put your own investment money into each deal in equal or greater amounts, as with Herb and Bob's prior purchases, makes my desire to co-participate appealing. Finally, based upon our discussion, your understanding is that the sale of mineral rights are [*sic*] not governed by the SEC or state securities regulations.

11

38.

On March 15, 2013, in response to the March 12, 2013 e-mail from the private investigator, Sonnier sent an e-mail to the private investigator stating "You are correct as to you [*sic*] interpretation of how Kris works his deals with Herb, Bob and myself."

39.

On April 2, 2013, Herb Schaffer, through his assistant Minnie Lim, sent an e-mail to Melancon stating, *inter alia*, "please confirm that the offer is subject to the same condition of SFI's prior royalty purchases, in that the royalties offered are sold to SFI at your purchase price +3% fee."  On that same day, Melancon responded that "Yes, the offer is subject to the same terms and conditions of SFI prior purchases and a 3% fee added to the per acre cost total."

40.

Defendants and their agent Sonnier made false representations to Plaintiffs concerning their purchase of the OGM Royalty Interests.  For example:

(a)     The purchase price paid by Plaintiffs for OGM Royalty Interests purchased from the Defendants was not (i) the actual purchase cost paid by the Defendants or (ii) the actual purchase cost paid by the Defendants plus three percent (3%).  Instead, the purchase price actually charged to Plaintiffs by the Defendants and actually paid by Plaintiffs to the Defendants far exceeded the actual purchase cost paid by the Defendants.

(b)     Sonnier and the Defendants did not acquire and invest the amounts in the OGM Royalty Interests as set forth above relative to that acquired by Plaintiffs.  Instead, the Defendants sold Plaintiffs most of the interests in the OGM Royalty Interests, retaining little or no financial stake in each OGM Royalty Interests.

(c)     Defendants and Sonnier received a financial benefit from Plaintiffs' purchases far in excess of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests by SFI and by Schaffer along with SFI.  As alleged above, the payments received by the Defendants from Plaintiffs for OGM Royalty Interests far exceeded the amounts that the Defendants paid for those OGM Royalty Interests.  Sonnier received, from one or more of the Defendants, a portion of the money paid by Plaintiffs to purchase OGM Royalty Interests as a "finder's fee" to Sonnier for inducing Plaintiffs to make such purchases, and Sonnier, via Media/Right received additional monies from the Defendants out of the monies paid by Plaintiffs as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Defendants.

(d)     the OGM Royalty Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented.

(e)     The term of the OGM Royalty Interests in Louisiana was often sometimes less than 10 years (*i.e.*, the royalty would expire in less than 10 years unless there was a valid and

12

existing oil and gas lease from which oil and/or gas was being produced in paying quantities) for OGM Royalty Interests as to which Defendants had represented a 10-year term, and, for the OGM Royalty Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

41.

Plaintiffs would not have purchased the OGM Royalty Interests from Defendants had Plaintiffs known that:

(a) Sonnier and the Defendants would not be investing their own personal money, or money from related entities, on the basis that Defendants represented to Plaintiffs;

(b) Plaintiffs were paying far more than the price paid by the Defendants;

(c) Defendants and Sonnier were receiving substantial additional financial benefits from Plaintiffs' purchases, *i.e.*, they were making secret profits;

(d) the OGM Royalty Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented;

(e) the term of the OGM Royalty Interests in Louisiana was sometimes less than 10 years, and, for the OGM Royalty Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

42.

As a result of Defendants' wrongful conduct inducing Plaintiffs to purchase the OGM Royalty Interests from the Melancon Defendants, Plaintiffs have incurred substantial losses in an amount to be proved at trial.

**D.    The "Flip Properties."**

43.

Between about August 2009 and about October 2009, Schaffer purchased OGM Royalty Interests in three sets of properties (the "Flip Properties") from the Defendants based on the representation by Defendants and their agent Sonnier to Schaffer that they would be reselling them within a two- to four-month period, at a quick profit.

44.

Defendants and their agent Sonnier represented at various times from August 2009 through October 2009 that they were each purchasing at least the same shares of OGM Royalty

13

Interests as Schaffer in the three sets of Flip Properties.  It was Schaffer's understanding that the OGM Royalty Interests in the Flip Properties purchased with Schaffer's money would be titled in Schaffer's name and that such OGM Royalty Interests would be purchased at the Defendants' actual purchase cost.  The parties agreed that the first two Flip Properties would be purchased 25% by Schaffer, 25% by Sonnier, and 50% by the Defendants, and that the Defendants would receive 50% of any profits made by Schaffer or Sonnier.  The parties agreed that the third set of Flip Properties would be purchased 33.33% by Schaffer, 33.33% by Sonnier, and 33.33% by the Defendants, and that any profit made by Schaffer and Sonnier on the resale of the third set of Flip Properties to be purchased by Schaffer and Sonnier would be split 60% to Schaffer and 60% to Sonnier as to their purchases and 40% to the Defendants.

45.

Schaffer paid Defendants $194,500 for his share of the OGM Royalty Interests in the first set of Flip Properties, through a payment of $100,000 made on August 13, 2009, a payment of $87,500 made on August 31, 2009, and a payment of $7,000 made on October 5, 2009 to reimburse Sonnier for a portion of Sonnier's investment in such Flip Property made on behalf of Schaffer.  Defendants told Schaffer that his first $100,000 payment would be used to purchase OGM Royalty Interests located in Red River Parish, Louisiana for quick resale, but did not specify the acreage or provide a legal description at the time of purchase.  Defendants also told Schaffer that his payment of $87,500 would, along with $80,000 in proceeds from the sale of an unspecified portion of the proceeds of the sale of OGM Royalty Interests located in Red River Parish, Louisiana that was initially purchased with the $100,000 payment made on August 13, 2009, be used to purchase additional OGM Royalty Interests of 40 acres in Caddo Parish, Louisiana.  As alleged more fully herein, Schaffer purchased OGM Royalty Interests in this set of Flip Properties based upon the representations by Defendants alleged herein.

46.

On September 29, 2009, Schaffer paid Defendants $125,000 for his share of the OGM Royalty Interests in the second set of Flip Properties.  Defendants told Schaffer that his payment would be used to purchase OGM Royalty Interests in Red River Parish, Louisiana for quick resale, but did not specify the acreage or provide a legal description at the time of the purchase.  As alleged more fully herein, Schaffer purchased OGM Royalty Interests in this set of Flip Properties based upon the representations by Defendants alleged herein.

47.

On October 23, 2009, Sonnier sent Schaffer an e-mail soliciting his purchase of a one-third share in OGM Royalty Interests in 556.74 acres total (comprised of four specifically identified tracts of 321 acres, 87 acres, 67.74 acres, and 81 acres, respectively).  That e-mail

14

asked Schaffer for "a capital contribution of $835,110.00 (1/3) payable to Pinnacle" for Schaffer's purchase of his one-third share (or 185.58 acres) of OGM Royalty Interests in that acreage.  Sonnier told Schaffer that the four tracts "belong to one landowner who has been contacted by Petrohawk, Chesapeake, and Comstock to lease these tracts" and that "[t]hey have all offered $6,000.00/acre and ¼ royalty."  The e-mail stated that the landowner had told Defendants "that if we would show up with $4,500.00/acre in the form of a cashier's check that she would lease to us" and that "we should be able to flip this lease for $1,500.00/acre profit to which ever [sic] of the 3 companies pays us the $6,000.00/acre that they have offered to the landowner."

48.

In reliance upon these representations and the other representations alleged herein, Schaffer on October 29, 2009 wired the Defendants $835,110 to purchase a one-third share of the specified OGM Royalty Interests in this third set of Flip Properties.

49.

Several months after the purchase of OGM Royalty Interests in this third set of Flip Properties, ExxonMobil Corp. ("Exxon") acquired certain substantial gas production rights purportedly in the areas where Schaffer and Defendants had invested.  Defendants and Sonnier induced Schaffer to consent to retention of the OGM Royalty Interests in the Flip Properties based upon Melancon's assertion that he wanted to see the effect of Exxon's purchase on the market.

50.

In early 2011, when Schaffer was preparing his tax projection, Sonnier told Schaffer that Schaffer would have a large capital gain with regard to the OGM Royalty Interests in this third set of Flip Properties.  Thereafter, Schaffer was informed by Sonnier that the OGM Royalty Interests in this third set of Flip Properties had been sold to Exxon in late 2010 and that "they" had received their $835,000 back plus a "small" profit of approximately $1,500 per acre, plus a 1% override of whatever Exxon received from oil royalties.  Sonnier told Schaffer that Melancon had decided, without Schaffer's knowledge or consent, to forego the large cash gains from such purported sale and instead retained the override interest.

51.

In September 2011, Schaffer asked Sonnier for more specific information on the claimed sale to Exxon and for an accounting of the Flip Properties that had purportedly been bought and resold.  Sonnier told Schaffer that he did not need to worry about reporting the gain on his income taxes because the OGM Royalty Interests in the Flip Properties had all been put in the name of Melancon's corporation, Pinnacle, and any reporting of income was in Pinnacle's name.

15

52.

Upon learning that title to the OGM Royalty Interests in the Flip Properties had been placed in Pinnacle's name, Schaffer discussed his concerns with Sonnier.  Sonnier told Schaffer that he had similar concerns and that Melancon would provide Schaffer and Sonnier with a document disclosing their entitlement to receive funds from Pinnacle so that they would be protected in case something happened to Melancon before the monies were distributed to them. However, no such documents were provided in spite of Schaffer's repetitive requests to Sonnier. Sonnier told Schaffer that Melancon was busy and would provide the documents late in 2011, when the industry would slow down and Melancon would have more time.  The same delays, and the same excuse, continued into 2012.

53.

Although Schaffer had been asking for information on the OGM Royalty Interests in the Flip Properties periodically since late 2010, it was not until fall 2012 that Melancon provided any documents that purportedly accounted for the disposition of the OGM Royalty Interests in the Flip Properties.  Those documents were incomprehensible not only to Schaffer, but also to his advisor John Miller, a Certified Professional Landman with in-depth knowledge of such matters.

54.

Beginning in early fall 2012 and continuing through mid-April 2013, and only because SFI told Defendants that it would not purchase any additional OGM Royalty Interests from them if the requested information concerning the Flip Properties was not provided, Defendants finally provided Schaffer information with regard to the use of the moneys that he paid to purchase OGM Royalty Interests in the Flip Properties.

55.

The documents and information provided to Schaffer in late March 2013 and mid-April 2013 indicated, *inter alia*, that:

(a) the monies Schaffer paid to purchase the Flip Properties were not used to purchase OGM Royalty Interests in the specific acreages and locations that had been presented to Schaffer at the time of his purchases;

(b) such funds had instead been used to purchase OGM Royalty Interests in other properties in other locations;

(c) while Defendants have claimed that they sold the OGM Royalty Interests in the Flip Properties and used those proceeds to purchase various OGM Royalty Interests in such other properties, the OGM Royalty Interests that were supposedly purchased with the proceeds from the purported sale of the OGM Royalty Interests were apparently purchased well before the OGM Royalty Interests in the Flip Properties were supposedly sold;

16

(d) Schaffer received OGM Royalty Interests in 127.846 acres, rather than in 185.58 acres (one-third of 556.74 acres) as had been represented to Schaffer;

(e) Schaffer was therefore charged $6,534 per acre, rather than the $4,500 per acre represented by Defendants at the time of purchase, and Schaffer was charged an extra fee of $19,050 that was never disclosed at the time of purchase and to which he did not agree;

(f) many of the OGM Royalty Interests had expired between October 2012 and February 2013, contrary to Defendants' assertion that no rights on any OGM Royalty Interests had expired or were anticipated to expire; (g) the purchases were made in the name of Pinnacle, rather than in the name of Schaffer; (h) Defendants purported to have sold, for about $601,812.60, 87.182 acres of the OGM Royalty Interests that they claimed to have purchased with proceeds from the sale of Schaffer's OGM Royalty Interests in the third set of Flip Properties;

(i) Defendants purported to have used Schaffer's proceeds from that sale to purchase, for $581,435.94, 186.50 acres of other OGM Royalty Interests (but Plaintiffs are informed and believe, and based thereon allege, that there is no official record of any purchases of these OGM Royalty Interests, or that Schaffer has any interest in such OGM Royalty Interests);

(j) Defendants represented that there was a "pending" sale of 35 acres of OGM Royalty Interests to Petrohawk, but Defendants provided no information or sales proceeds as to such "pending" sale; and

(k) Defendants did not account for five remaining acres of OGM Royalty Interests that they said are owned by Schaffer.

56.

Schaffer did not authorize the purchases of OGM Royalty Interests made by Defendants with the monies provided by Schaffer to purchase OGM Royalty Interests in the third set of Flip Properties or with the proceeds from any sale of Schaffer's OGM Royalty Interests in the third set of Flip Properties.

57.

Plaintiffs are informed and believe, and based thereon allege, that Defendants never purchased OGM Royalty Interests in any of the Flip Properties as to which they sold OGM Royalty Interests to Schaffer.

58.

Schaffer has never received back any portion of the money that he invested in the OGM Royalty Interests in the Flip Properties, nor any return on those investments.

17

E.     **Failure to Provide Marketable Title.**

59.

Defendants agreed that, in the event they were unable to deliver marketable title to the OGM Royalty Interests, they would refund the monies paid by Plaintiffs for those OGM Royalty Interests.

60.

Defendants did not deliver marketable title to certain of the OGM Royalty Interests they sold to Plaintiffs, including, *inter alia*, at least 13.96 royalty acres in South Fulton Prospect sold to Plaintiffs on or about February 28, 2012. However, Defendants have not refunded the monies paid by Plaintiffs for those OGM Royalty Interests.

**The Federal Action**

61.

On August 9, 2013, Plaintiffs filed a Complaint against the Defendants and Sonnier in the United States District Court for the Central District of California (the "Federal Action").  On January 15, 2014, Plaintiffs and Defendants reached a written agreement whereby Defendants agreed that any claims that the Plaintiffs asserted and/or may have asserted against the Defendants be tolled/suspended and reserved, and that prescription/statute of limitations not begin to run again until January 16, 2015.  On February 7, 2014, Plaintiffs filed a notice of dismissal without prejudice of their claims asserted against Defendants in the Federal Action.

62.

The Defendants further agreed, among other things, to maintain and preserve all relevant documents in their possession, custody, or control, including all documents stored on computers or on the Internet (including emails).

**FIRST CLAIM FOR RELIEF**
**(Federal Securities Law Violations**
**Based upon Sale of Unregistered Securities,**
**15 U.S.C. §§ 77e(a), 77*l*(a))**

63.

Plaintiffs refer and incorporate paragraphs 1 through 62 of the Petition herein by reference as though set forth in full.

64.

Any fractional undivided OGM Royalty Interests sold by Defendants to Plaintiffs (the "Fractional Undivided Interests") constituted securities.

65.

Defendants failed to register the Fractional Undivided Interests sold to Plaintiffs as investment securities as required by the Securities Exchange Act of 1933, and the subsequent

18

offer and sale of such Fractional Undivided Interests to Plaintiffs was therefore unlawful.  As a result, Defendants are jointly and severally liable to Plaintiffs for any sale of such Fractional Undivided Interests to Plaintiffs.

### SECOND CLAIM FOR RELIEF
#### (Federal Securities Law Violations
#### Based upon False Representations and Nondisclosures,
#### 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5)

66.

Plaintiffs refer to paragraphs 1 through 65 of the Petition, inclusive, and incorporate them by reference as though set forth in full.

67.

The Securities & Exchange Commission (the "SEC") promulgated SEC Rule 10b-5, codified as 17 C.F.R. § 240.10b-5.  Rule 10b-5(a) prohibits the employment of any "device, scheme or artifice to defraud" in connection with the purchase or sale of a security.  17 C.F.R. § 240.10b-5(a).  Rule 10b-5(b) prohibits the offer or sale of securities by making "any untrue statement of fact" or "omit[ting] to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Rule 10b-5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(c).

68.

Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive Plaintiffs with regard to the value of the Fractional Undivided Interests offered to them by Defendants; and (b) cause Plaintiffs to purchase the Fractional Undivided Interests at artificially inflated prices..  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.

Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under 15 U.S.C. §§ 78t(a) and (b).

70.

Defendants and Sonnier, individually and in concert, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in violation of 15 U.S.C.

19

§ 78j(b) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

71.

Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the value of the Fractional Undivided Interests purchased by Plaintiffs.

72.

Defendants and Sonnier, individually and in concert, employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of the value of the Fractional Undivided Interests, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the value of the Fractional Undivided Interests in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs as the purchasers of the Fractional Undivided Interests.

73.

Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the claimed inflated value of the Fractional Undivided Interests.  If any Defendant did not have actual knowledge of the misrepresentations and omissions alleged herein, he or it was reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading.

74.

As a result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the claimed market value of the Fractional Undivided Interests purchased by Plaintiffs was artificially inflated.  In ignorance of the fact that the claimed market value of the Fractional Undivided Interests was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants to Plaintiffs, Plaintiffs

NO BMB1 584385 v2
2932057-000001 01/14/2015

acquired the Fractional Undivided Interests from Defendants at artificially high prices and were damaged because the Fractional Undivided Interests did not have the value represented by Defendants.

75.

At the time of said misrepresentations and omissions, Plaintiffs believed them to be true. Had Plaintiffs known the truth regarding the Fractional Undivided Interests, Plaintiffs would not have purchased or otherwise acquired the Fractional Undivided Interests.

76.

At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of OGM Royalty Interests from the Defendants.    Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 OGM Royalty Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations, the fiduciary duty owed to them by Defendants to Plaintiffs as joint venturers.

77.

By virtue of the foregoing, Defendants have violated 15 U.S.C. § 78j and Rule 10b-5 promulgated thereunder.

78.

As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Fractional Undivided Interests in an amount to be proven at trial.

79.

Based upon Defendants' violations of Rule 10b-5 alleged herein, Plaintiffs are entitled to rescission of their investments in the Fractional Undivided Interests, or in the alternative to damages, with interest accruing thereon at the legal rate.

80.

Defendants intentionally, willfully, and with malicious intent violated Rule 10b-5.  They intentionally and fraudulently misrepresented the value of the Fractional Undivided Interests to be sold to Plaintiffs, all as part of an intentional plan to defraud.  Consequently, Defendants are liable for punitive damages.

21

## THIRD CLAIM FOR RELIEF
### (Louisiana Securities Law Violations
### Based upon Sale of Unregistered Securities,
### La. Rev. Stat. §§ 51:714, 51:712(A)(1), 51:705)

81.

Plaintiffs refer to paragraphs 1 through 80 of the Petition, and incorporate them by reference as though set forth in full.

82.

Defendants offered Plaintiffs, and Plaintiffs purchased from Defendants, the Fractional Undivided Interests for the amounts stated in Exhibits A and B attached hereto.

83.

Each Fractional Undivided Interest referenced herein is a security within the meaning of La. Rev. Stat. § 51:702(15)(a) as a "fractional undivided interest in oil, gas, or other mineral rights."

84.

At the time of Plaintiffs' acquisition of each Fractional Undivided Interest referenced herein, each sale was subject to qualification, was not exempt from qualification, and was not qualified as any kind of securities transaction with the Louisiana Commissioner of Financial Institutions; to the present date, none of the Fractional Undivided Interests has been qualified as any kind of securities transaction with the Louisiana Commissioner of Financial Institutions. Pursuant to La. Rev. Stat. §§ 51:705 and 51:712(A)(1), it was unlawful for Defendants to offer or sell the Fractional Undivided Interests from the State of Louisiana unless such securities were qualified or exempted.

85.

At no time were Plaintiffs aware that the Fractional Undivided Interests may not have complied with the requirements of Louisiana law. It was not until in or about April 2013 that Plaintiffs first became aware of Defendants' failure to comply with La. Rev. Stat. § 51:705, the ramifications thereof, and the remedies available as a result.

86.

As a result of these violations, Defendants are liable to Plaintiffs under La. Rev. Stat. § 51:714(A), and Plaintiffs are entitled to recover the consideration paid in cash, with interest thereon from the date of payment down to the date of repayment, less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees.

22

### FOURTH CLAIM FOR RELIEF
#### (Louisiana Securities Law Violations
#### Based upon False Representations and Nondisclosures,
#### La. Rev. Stat. §§ 51:714, 51:712(A)(2), 51:712(D))

87.

Plaintiffs refer to paragraphs 1 through 86 of the Petition, and incorporate them by reference as though set forth in full.

88.

La. Rev. Stat. § 51:712(A)(2) prohibits an offer to sell or the sale of a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or the omission.

89.

La. Rev. Stat. § 51:712(D)(1) prohibits the employment of any "device, scheme or artifice to defraud" in connection with the purchase or sale of a security.

90.

La. Rev. Stat. § 51:712(D)(2) makes it unlawful to "engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon" the purchaser or seller in connection with the purchase or sale of any security.

91.

Defendants carried out a transaction, plan, scheme, and course of conduct which was intended to, and did: (a) deceive Plaintiffs with regard to the value of the Fractional Undivided Interests offered to them by Defendants; and (b) cause Plaintiffs to purchase the Fractional Undivided Interests at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein. Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under La. Rev. Stat. § 51:714(B).

92.

Defendants and Sonnier, individually and in concert,  (a) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (b) employed devices, schemes, and artifices to defraud; and (c) engaged in transactions, acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in violation of La. Rev. Stat. §§ 51:712(A)(2) and 51:712(D).  All Defendants are sued

23

either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

93.

Defendants, individually and in concert, directly and indirectly engaged and participated in a continuous course of conduct to misrepresent the value of the Fractional Undivided Interests.

94.

Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under La. Rev. Stat. §§ 51:714(B).

95.

Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of the value of the Fractional Undivided Interests, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the value of the Fractional Undivided Interests in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs as the purchasers of the Fractional Undivided Interests.

96.

Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of supporting the claimed inflated value of the Fractional Undivided Interests. If any Defendant did not have actual knowledge of the misrepresentations and omissions alleged herein, he or it was reckless in failing to obtain such knowledge by deliberately refraining from taking the steps necessary to discover whether those statements were false or misleading.

97.

As a result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the claimed market value of the Fractional Undivided Interests purchased by Plaintiffs was artificially inflated. In ignorance of the fact that the claimed market value of the Fractional Undivided Interests was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or

24

recklessly disregarded by Defendants but not disclosed by Defendants to Plaintiffs, Plaintiffs acquired the Fractional Undivided Interests from Defendants at artificially high prices and were damaged because the Fractional Undivided Interests did not have the value represented by Defendants.

98.

At the time of said misrepresentations and omissions, Plaintiffs believed them to be true. Had Plaintiffs known the truth regarding the Fractional Undivided Interests, Plaintiffs would not have purchased or otherwise acquired the Fractional Undivided Interests.

99.

At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein. Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of OGM Royalty Interests from the Defendants. Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 OGM Royalty Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations and the fiduciary duty owed to them by the Defendants.

100.

By virtue of the foregoing, Defendants have violated La. Rev. Stat. §§ 51:712(A)(2) and 51:712(D).

101.

As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Fractional Undivided Interests in an amount to be proven at trial.

102.

As a result of these violations, Defendants are liable to Plaintiffs under La. Rev. Stat. § 51:714(A), and Plaintiffs are entitled to recover the consideration paid in cash, with interest thereon from the date of payment down to the date of repayment, less the amount of any income received thereon, together with all taxable court costs and reasonable attorneys' fees.

103.

Defendants intentionally, willfully, and with malicious intent violated the Louisiana securities laws. They intentionally and fraudulently misrepresented the value of the Fractional

25

Undivided Interests to be sold to Plaintiffs, all as part of an intentional plan to defraud Plaintiffs of an amount to be proven at trial. Consequently, Defendants are liable for punitive damages.

## FIFTH CLAIM FOR RELIEF
### (California Securities Law Violations
### Based upon Sale of Unregistered Securities,
### Cal. Corp. Code §§ 25110, 25503)

104.

Plaintiffs refer to paragraphs 1 through 103 of the Petition, inclusive, and incorporate them by reference as though set forth in full.

105.

Defendants offered to sell and sold Plaintiffs, and Plaintiffs purchased from Defendants, the Fractional Undivided Interests for the amounts stated in Exhibits A and B attached hereto.

106.

Each Fractional Undivided Interest referenced herein is a security within the meaning of Cal. Corp. Code § 25019, by virtue of the fact that: (a) each Interest is a certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under that title or lease; and/or (b) the transactions are investment contracts under California law.

107.

At the time of Plaintiffs' acquisition of each Fractional Undivided Interest referenced herein, each offer to sell and sale was subject to qualification, was not exempt from qualification, and was not qualified as any kind of securities transaction with the California Commissioner of Corporations; to the present date, none of the Fractional Undivided Interests has been qualified as any kind of securities transaction with the California Commissioner of Corporations. Pursuant to Cal. Corp. Code § 25110, it was unlawful for Defendants to offer to sell or sell the Fractional Undivided Interests in the State of California unless such securities were qualified or exempted.

108.

At no time were Plaintiffs aware that the Fractional Undivided Interests may not have complied with the requirements of California law. It was not until in or about April 2013 that Plaintiffs first became aware of Defendants' failure to comply with Cal. Corp. Code § 25019, the ramifications thereof, and the remedies available as a result.

109.

As a result of the above-described acts, Defendants are liable to Plaintiffs, and pursuant to Cal. Corp. Code § 25503 Plaintiffs are entitled to, and hereby do, rescind the above-described purchases of Fractional Undivided Interests made two years or less prior to the filing of the Federal Lawsuit on August 9, 2013 (and therefore are entitled to recover the consideration Plaintiffs paid for the Fractional Undivided Interests with interest thereon at the legal rate, less

26

the amount of any income received therefrom) and to recover damages to the extent that Plaintiffs no longer own such Fractional Undivided Interests (calculated as the difference between Plaintiffs' purchase price plus interest at the legal rate from the date of purchase, less the value of the Fractional Undivided Interests at the time they were disposed of by Plaintiffs plus the amount of any income received therefrom by Plaintiffs).

### SIXTH CLAIM FOR RELIEF
**(California Securities Law Violations
Based upon False Representations and Nondisclosures,
Cal. Corp. Code §§ 25401, 25501)**

110.

Plaintiffs refer to paragraphs 1 through 109 of the Petition, inclusive, and incorporate them by reference as though set forth in full.

111.

Defendants offered to sell and sold Plaintiffs, and Plaintiffs purchased from Defendants, the Fractional Undivided Interests for the amounts stated in Exhibits A and B attached hereto.

112.

These transactions were all accomplished by means of written and oral communications by Defendants, through the false representations by Sonnier alleged herein, acting on his own behalf and as the agent of the Defendants, to Plaintiffs in the State of California, which included untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Cal. Corp. Code § 25401, subjecting Defendants to liability under Cal. Corp. Code § 25501. Plaintiffs purchased the Fractional Undivided Interests from Defendants in the State of California. Said misrepresentations and omissions consisted of, among others, the following:

(a) the purchase price to be paid by Plaintiffs for any OGM Royalty Interests purchased from the Defendants would be the actual purchase cost paid by the Defendants (with regard to Schaffer's purchases of OGM Royalty Interests prior to his purchase of OGM Royalty Interests along with SFI) or the actual purchase cost paid by the Defendants plus three percent (3%) (with regard to SFI's purchases of OGM Royalty Interests and Schaffer's purchases of OGM Royalty Interests along with SFI);

(b) Sonnier and the Defendants would each acquire and invest at least an equal amount of money in, OGM Royalty Interests to be acquired by Schaffer or by both SFI and Schaffer, as is alleged in more detail above;

(c) with the exception of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests by SFI or by Schaffer along with SFI, there would be

27

no other financial benefit to Schaffer, SFI, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring OGM Royalty Interests on more favorable terms as a result of making combined purchases;

      (d)     the OGM Royalty Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the OGM Royalty Interests were sometimes invoiced with the locations to be provided at a later date); and

      (e)     the term of the OGM Royalty Interests in Louisiana would be 10 years (i.e., the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for OGM Royalty Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

113.

      Contrary to the foregoing, the true facts were:

      (a)     the purchase price paid by Plaintiffs for each Interest purchased from the Defendants greatly exceeded the actual purchase cost paid by the Defendants;

      (b)     Sonnier and the Defendants did not acquire and invest in OGM Royalty Interests to be acquired by Schaffer or by both SFI and Schaffer in the amounts alleged in more detail above, but instead sold Plaintiffs most of the interests in the OGM Royalty Interests, retaining little or no financial interest in each Interest;

      (c)     Defendants and Sonnier obtained a benefit from Plaintiffs' purchase of OGM Royalty Interests far in excess of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests by SFI and by Schaffer along with SFI, including, e.g., the extra amounts charged by the Defendants and the monies that Sonnier received from the Defendants as a "finder's fee" and, via Media/Right, from the additional monies paid by Plaintiffs to the Defendants as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Defendants;

      (d)     the OGM Royalty Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented; and

      (e)     the term of the OGM Royalty Interests in Louisiana was sometimes less than 10 years (i.e., the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), for leases that Defendants had not specifically disclosed would expire in a shorter period, and, for the OGM

28

Royalty Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

114.

At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein. Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of OGM Royalty Interests from the Defendants. Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 OGM Royalty Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations and the fiduciary duty owed by all Defendants to Plaintiffs as joint venturers.

115.

Defendants controlled each other, directly or indirectly, and engaged in their unlawful activities through or by means of each other, and they are each therefore jointly and severally liable under Cal. Corp. Code § 25504. Defendants are jointly and severally liable with Sonnier.

116.

As a result of the above-described acts, Defendants are liable to Plaintiffs, and pursuant to Cal. Corp. Code § 25501 Plaintiffs are entitled to, and hereby do, rescind the above-described purchases of Fractional Undivided Interests made five years or less prior to the filing of the Federal Lawsuit on August 9, 2013 (and therefore are entitled to recover the consideration Plaintiffs paid for the Fractional Undivided Interests with interest thereon at the legal rate, less the amount of any income received therefrom by Plaintiffs) and to recover damages to the extent that Plaintiffs no longer own such Fractional Undivided Interests (calculated as the difference between Plaintiffs' purchase price plus interest at the legal rate from the date of purchase, less the value of the Fractional Undivided Interests at the time they were disposed of by Plaintiffs, less the value of Fractional Undivided Interests at the time of purchase, not disposed of and presently owned by Plaintiffs, less the amount of any income received therefrom by Plaintiffs).

29

## SEVENTH CLAIM FOR RELIEF
### (Fraud and/or Negligent Misrepresentation)

117.

Plaintiffs refer to paragraphs 1 through 116 of the Complaint, inclusive, and incorporate them by reference as though set forth in full.

118.

Plaintiffs' consent to the purchase of the OGM Royalty Interests from Defendants was not real, mutual, or free in that it was obtained through misrepresentation as alleged herein.

119.

In order to induce Plaintiffs to purchase the OGM Royalty Interests, Defendants represented that:

(a)    the purchase price to be paid by Plaintiffs for any OGM Royalty Interests purchased from the Defendants would be the actual purchase cost paid by the Defendants (with regard to Schaffer's purchases of OGM Royalty Interests prior to his purchase of OGM Royalty Interests along with SFI) or the actual purchase cost paid by the Defendants plus three percent (3%) (with regard to SFI's purchases of OGM Royalty Interests and Schaffer's purchases of OGM Royalty Interests along with SFI);

(b)    Sonnier and the Defendants would each acquire and invest in each of Plaintiffs' purchases of OGM Royalty Interests an amount of money as is alleged in more detail above;

(c)    with the exception of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests by SFI or by Schaffer along with SFI, there would be no other financial benefit to Schaffer, SFI, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring OGM Royalty Interests on more favorable terms as a result of making combined purchases;

(d)    the OGM Royalty Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the OGM Royalty Interests were sometimes invoiced with the locations to be provided at a later date); and

(e)    the term of the OGM Royalty Interests in Louisiana would be 10 years (i.e., the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for OGM Royalty Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

NO BMB1 584385 v2
2932057-000001 01/14/2015

120.

These representations were false when made.  The facts are that:

(a)     the purchase price paid by Plaintiffs for each Interest purchased from the Defendants greatly exceeded the Defendants' actual purchase cost;

(b)     Sonnier and the Defendants did not acquire and invest in OGM Royalty Interests to be acquired by Schaffer or by both SFI and Schaffer in the amounts alleged in more detail above, but instead sold Plaintiffs most of the interests in the OGM Royalty Interests, retaining little or no financial interest in each Interest;

(c)     Defendants and Sonnier obtained a benefit from Plaintiffs' purchase of OGM Royalty Interests far in excess of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests by SFI and by Schaffer along with SFI, including, e.g., the extra amounts paid to the Defendants, and the monies that Sonnier received from the Defendants as a "finder's fee" and, via Media/Right, from the additional monies paid by Plaintiffs to the Defendants as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Defendants;

(d)     the OGM Royalty Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented; and

(e)     the term of the OGM Royalty Interests in Louisiana was sometimes less than 10 years (i.e., the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities) for leases that Defendants had not specifically disclosed would expire in a shorter period, and, for the OGM Royalty Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term.

121.

At the time that Defendants made these false representations, Defendants knew or should have known of the falsity of the representations.

122.

Plaintiffs reasonably relied upon these false representations in deciding to purchase the OGM Royalty Interests from the Defendants.  Had Plaintiffs known the true facts, they would not have purchased the OGM Royalty Interests from the Defendants.

31

123.

Because Defendants are fiduciaries of Plaintiffs, Plaintiffs are entitled to recover as damages not only their out-of-pocket losses, but also their benefit-of-the-bargain damages.  As a result of their reasonable reliance upon Defendants' false representations, Plaintiffs have suffered injury in an amount to be proven at trial.

124.

At no time were Plaintiffs aware of the misrepresentations and omissions referenced herein.  Plaintiffs first became aware of the misrepresentations and omissions several months after August 13, 2012, the date of SFI's last purchase of Interests from the Defendants. Plaintiffs' delay in discovering such misrepresentations and omissions was reasonable in light of, inter alia, the massive number of purchases (more than 100 Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations and the fiduciary duty owed to them by Defendants.

125.

Plaintiffs would suffer substantial harm if the purchases of OGM Royalty Interests are not rescinded.

126.

Plaintiffs are entitled to a constructive trust as to the monies that they paid Defendants as a result of Defendants' fraud and/or negligent misrepresentation, and all proceeds therefrom.

### EIGHTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duty – Joint Venturers)**

127.

Plaintiffs refer to paragraphs 1 through 125 of the Petition, inclusive, and incorporate them by reference as though set forth in full.

128.

Defendants, as putative joint venturers of Plaintiffs with regard to the purchases to be made by Plaintiffs, Sonnier, and the Defendants, owed Plaintiffs a fiduciary duty to act with due care and in the highest good faith and not to obtain an improper advantage over them through any misconduct, misrepresentation, or concealment.

32

129.

Defendants breached their fiduciary duties to Plaintiffs through the conduct alleged herein with regard to the OGM Royalty Interests that were the subject of the putative joint venture, including, but not limited to: (a) obtaining from Plaintiffs a purchase price for OGM Royalty Interests purchased from the Defendants that greatly exceeded the Defendants' actual purchase cost; and (b) failing to invest and acquire an interest in any OGM Royalty Interests to be acquired by Schaffer or by both SFI and Schaffer in the amounts alleged in more detail above.

130.

The Defendants also breached their fiduciary duties to Plaintiffs by paying Sonnier for inducing Plaintiffs to purchase OGM Royalty Interests.

131.

As a direct and proximate result of Defendants' violation of their fiduciary duties to Plaintiffs, Plaintiffs have suffered injury in an amount to be proven at trial.

132.

At no time were Plaintiffs aware of the breaches of fiduciary duty referenced herein. Plaintiffs first became aware of the breaches of fiduciary duty several months after August 13, 2012, the date of SFI's last purchase of OGM Royalty Interests from the Defendants. Plaintiffs' delay in discovering such breaches of fiduciary duties was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 OGM Royalty Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations and the fiduciary duty owed by Defendants to Plaintiffs.

133.

Plaintiffs are entitled to a constructive trust as to their share of the income received by the joint venture of Plaintiffs and Defendants, and all proceeds therefrom.

### NINTH CLAIM FOR RELIEF
**(Breach of Contract – Purchases of OGM Royalty Interests)**

134.

Plaintiffs refer to paragraphs 1 through 132 of the Petition, inclusive, and incorporate them by reference as though set forth in full.

135.

Each agreement pursuant to which Plaintiffs purchased OGM Royalty Interests from Defendants is a separate binding contract, founded upon an instrument in writing, e-mails sent by

33

Sonnier to Plaintiffs offering OGM Royalty Interests for purchase by Plaintiffs.  Each such agreement provided that:

(a)     the purchase price to be paid by Plaintiffs for any OGM Royalty Interests purchased from the Defendants would be the actual purchase cost paid by the Defendants (with regard to Schaffer's purchases of OGM Royalty Interests prior to his purchase of OGM Royalty Interests along with SFI) or the actual purchase cost paid by the Defendants plus three percent (3%) (with regard to SFI's purchases of OGM Royalty Interests and Schaffer's purchases of OGM Royalty Interests along with SFI);

(b)     Sonnier and the Defendants would each acquire and invest an amount of money in, OGM Royalty Interests to be acquired by Schaffer or by both SFI and Schaffer as is alleged in more detail above;

(c)     with the exception of the three percent (3%) mark-up charged by the Defendants and Sonnier on the purchase of OGM Royalty Interests by SFI or by Schaffer along with SFI, there would be no other financial benefit to Schaffer, SFI, Melancon, or Sonnier, except for the benefit, shared jointly, of acquiring OGM Royalty Interests on more favorable terms as a result of making combined purchases;

(d)     the OGM Royalty Interests would be purchased at a specified price and in a specified number of royalty acres at a specified location (the OGM Royalty Interests were sometimes invoiced with the locations to be provided at a later date);

(e)     the term of the OGM Royalty Interests in Louisiana would be 10 years (i.e., the royalty would expire in 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), unless the royalty was specifically disclosed to expire in a shorter period, or, for OGM Royalty Interests with terms of less than 10 years, that there was imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term; and

(f)     in the event Defendants were unable to deliver marketable title to OGM Royalty Interests, they would refund the monies paid by Plaintiffs for those OGM Royalty Interests.

136.

Defendants breached each agreement pursuant to which Plaintiffs purchased OGM Royalty Interests from Defendants based upon one or more of the following grounds:

(a)     the purchase price paid by Plaintiffs for each Interest purchased from the Defendants greatly exceeded the actual purchase cost paid by the Defendants;

(b)     Sonnier and the Defendants did not acquire or invest in OGM Royalty Interests to be acquired by Schaffer or by both SFI and Schaffer in the amounts alleged in more detail above,

34

but instead sold Plaintiffs most of the interests in the OGM Royalty Interests, retaining little or no financial interest in each Interest;

(c)     Defendants obtained a benefit from Plaintiffs' purchase of OGM Royalty Interests far in excess of the three percent (3%) mark-up charged by the Defendants on the purchase of OGM Royalty Interests by SFI and by Schaffer along with SFI, including, e.g., the extra amounts charged by the Defendants, and the monies that Sonnier received from the Defendants as a "finder's fee" and, via Media/Right, from the additional monies paid by Plaintiffs to the Defendants as a result of Sonnier's fraudulent mark-ups of the prices quoted to Sonnier by the Defendants;

(d)     the OGM Royalty Interests that were actually sold to Plaintiffs were often purchased at a price that was greater than that represented, in royalty acreage that was less than that represented, and/or at a location different than that represented;

(e)     the term of the OGM Royalty Interests in Louisiana was sometimes less than 10 years (i.e., the royalty would expire in less than 10 years unless there was a valid and existing oil and gas lease from which oil and/or gas was being produced in paying quantities), for leases that Defendants had not specifically disclosed would expire in a shorter period, and, for the OGM Royalty Interests that were represented as having terms of less than 10 years, there sometimes was not imminent planned production that would be completed within such shortened term so that the OGM Royalty Interests being acquired would be secured by production within such term; and

(f)     Defendants did not deliver marketable title to certain of the OGM Royalty Interests they sold to Plaintiffs, but they have not refunded the monies paid by Plaintiffs for those OGM Royalty Interests.

137.

As a direct and proximate result of Defendants' breach of their contractual obligations with regard to Plaintiffs' purchases of OGM Royalty Interests, Plaintiffs have suffered injury in an amount to be proven at trial.

138.

At no time were Plaintiffs aware of the breaches of contract referenced above.  Plaintiffs first became aware of these breaches of contract several months after August 13, 2012, the date of SFI's last purchase of OGM Royalty Interests from the Defendants.  Plaintiffs' delay in discovering such breaches of contract was reasonable in light of, *inter alia*, the massive number of purchases (more than 100 OGM Royalty Interests), the technicalities of the transactions, and the unreasonable delay by Defendants in disclosing information and in giving Plaintiffs a complete accounting of the transactions (and such information, when provided, was frequently

35

disorganized, incomplete, and incomprehensible), as well as in light of Plaintiffs' justifiable reliance upon Defendants' representations and the fiduciary duty owed to them by Defendants.

### TENTH CLAIM FOR RELIEF
**(Unfair Trade Practices - La. Rev. Stat. 51:1401-1430)**

139.

Plaintiffs refer to paragraphs 1 through 137 of the Petition, inclusive, and incorporate them by reference as though set forth in full.

140.

Within four years prior to the filing of this lawsuit on August 9, 2013, Defendants, by doing the acts alleged herein, have violated La. Rev. Stat. 51:1401-1430 (the "LUTPA"), and have engaged in unlawful, unfair, and fraudulent business practices constituting statutory unfair competition in violation of the LUTPA.

141.

By means of Defendants' unlawful, unfair, and fraudulent business practices in violation of the LUTPA, Defendants have acquired money from Plaintiffs.

142.

Pursuant to the LUTPA, the Court should enter a judgment as necessary to restore to Plaintiffs the monies that Defendants have acquired by means of such unfair competition.

### ELEVENTH CLAIM FOR RELIEF
**(Conversion)**

143.

Plaintiffs refer to paragraphs 1 through 141 of the Petition, and incorporate them by reference as though set forth in full.

144.

By means of Defendants' unlawful, unfair, and fraudulent business practices, as detailed above, Defendants have improperly converted significant funds from Plaintiffs.

145.

Defendants are liable to Plaintiffs for all damages resulting from their conversion, any amounts by which the Defendants have been unjustly enriched in connection therewith, along with court costs and attorney's fees incurred by Plaintiffs in the initiation and prosecution of this action.

NO BMB1 584385 v2
2932057-000001 01/14/2015

## TWELFTH CLAIM FOR RELIEF
### (Accounting)

146.

Plaintiffs refer to paragraphs 1 through 144 of the Petition, and incorporate them by reference as though set forth in full.

147.

Plaintiffs are entitled to an accounting with regard to Plaintiffs' OGM Royalty Interests, including, *inter alia*, Defendants' receipt of monies from Plaintiffs and their use of such monies by Defendants, payments to the Defendants for Melancon to purchase each Interest, the location, size, and legal description of each purchase of any OGM Royalty Interests (for each actual purchase, and as compared to the location, size, and legal description for which the Defendants invoiced Plaintiffs in connection with the original purchase of the OGM Royalty Interests), the amount of money each Defendant invested in each Interest that was purchased by Plaintiffs, how title was taken for each of Plaintiffs' purchases, all documents reflecting transfers of title to the OGM Royalty Interests (including copies of all valid assignments to Plaintiffs of the Interest purchased by Plaintiffs), and for any OGM Royalty Interests sold by Defendants, a description of what was sold, the amount of money received from any such resale, and an accounting of the disposition of proceeds of any such resale.

148.

Defendants have received and possess money due to Plaintiffs with regard to Plaintiffs' OGM Royalty Interests. The amount of money due to Plaintiffs is unknown and cannot be determined without a complete accounting with regard to the OGM Royalty Interests.

149.

Plaintiffs have on frequent occasions requested an accounting from Defendants with regard to the OGM Royalty Interests purchased by Plaintiffs. Defendants have agreed to provide an accounting, yet Defendants have failed to provide a meaningful response to the requests made.

## PRAYER

WHEREFORE, plaintiffs Schaffer Family Investors, LLC and Robert Schaffer pray for judgment as follows:

1. For rescission of all of Plaintiffs' purchases of OGM Royalty Interests, and for return to Plaintiffs of all monies paid in connection with such purchases, in an amount to be proven at trial;

2. For compensatory damages in an amount to be proven at trial;

3. For a constructive trust over all monies acquired by Defendants from Plaintiffs, and all proceeds therefrom;

37

4.      For disgorgement of the monies acquired by Defendants from Plaintiffs;

5.      For an accounting from Defendants with regard to the OGM Royalty Interests purchased by Plaintiffs;

6.      For an Order awarding Plaintiffs all monies found due as a result of the accounting;

7.      For prejudgment interest at the maximum rate allowed by law;

8.      For punitive and exemplary damages in an amount sufficient to punish Defendants and set an example;

9.      For Plaintiffs' costs of suit herein;

10.     For reasonable attorneys' fees to the extent allowed by statute including, but not limited to, pursuant to La. Rev. Stat. § 51:714(A);

11.     For reasonable attorneys' fees to the extent allowed due to Defendants' conversion, fraud and otherwise tortious conduct;

12.     For costs of consultants, investigations, and discovery as necessary to mitigate damages resulting from Plaintiffs' wrongful conduct; and

13.     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

By: _____

BRIAN M. BALLAY (29077)
TYLER L. WEIDLICH (30790)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

*Counsel for Plaintiffs, SCHAFFER FAMILY
INVESTORS, LLC and ROBERT SCHAFFER*

A TRUE COPY
ATTEST _____
DEPUTY CLERK OF COURT

RECEIVED AND FILED

2015 JAN 16 PM 2:49

38

DEPUTY CLERK OF COURT
ST. MARTIN PARISH

**PLEASE SERVE:**

**THE ESTATE OF KRIS MELANCON**
Through its Administrator:
Parker Yelverton
515 South College, Suite 140
Lafayette, Louisiana  70503

**PARKER YELVERTON**
515 South College, Suite 140
Lafayette, Louisiana  70503

**PINNACLE OIL & GAS, LLC**
Through its registered agent:
Parker Yelverton
515 South College, Suite 140
Lafayette, Louisiana  70503

**LEMEL PETROLEUM, LLC**
Through its registered agent:
Parker Yelverton
515 South College, Suite 140
Lafayette, Louisiana  70503

NO BMB1 584385 v2
2932057-000001 01/14/2015

EXHIBIT "A"

INTERESTS PURCHASED BY ROBERT SCHAFFER

| Acquisition Date | Amount Paid | Check No./ Wire Transfer | Check/Wire Transfer Date | Seller | Represented Project Name / Property Location |
|---|---|---|---|---|---|
| | $36,000.00 | 1723 | 1/9/2009 | Pinnacle | Lafayette Parish, Louisiana, T9S-R3E, Section 25 |
| | $17,000.00 | 1732 | 2/17/2009 | Pinnacle | Haynesville Prospect in Bossier Parish, Louisiana, T12N-R11W, Section 4 |
| | $8,400.00 | 1740 | 3/15/2009 | Pinnacle | Calcasieu Parish, Louisiana, T9S-R12W, Section 11 |
| | $100,000.00 | 101 | 8/13/2009 | Pinnacle | Sabine Parish, T8N-R13W, Section 34 |
| | $87,500.00 | 103 | 8/31/2009 | Pinnacle | Sabine Parish, Louisiana, T9N-R12W, Section 19 |
| | $24,000.00 | 1686 | 9/29/2008 | Pinnacle | Red River Parish, T14N-R9W, Section 26; T14N-R9W Section 1; T12N-R9W, Section 19 & 36; T14N-R9W, Section 24 |
| | $125,000.00 | 104 | 9/29/2009 | Pinnacle | Red River Parish, Louisiana |
| | $7,000.00 | 110 | 10/5/2009 | Pinnacle | Sabine Parish, Louisiana, T10N-R14W, Section 21 |
| | $835,110.00 | Wire transfer | 10/25/2009 | Pinnacle | Sabine Parish, no legal description provided (185.58) acres |
| | $78,200.00 | 102 | 6/1/2010 | Pinnacle | Red River with some oil shale overlay in Bossier Parish, Louisiana |
| | $31,500.00 | 102 | 9/17/2010 | Pinnacle | Allen Parish, Louisiana; no legal description provided. |
| | $78,000.00 | 1011 | 4/15/2011 | Pinnacle | Granite Wash Prospect, Oklahoma, no legal description provided |
| | $150,000.00 | 1016 | 6/13/2011 | Pinnacle | Allen Parish, Louisiana, T6S-R4W, Section 18 |

1

A TRUE COPY

ATTEST

DEPUTY CLERK OF COURT

RECEIVED AND FILED

2015 JAN 16  PM 2: 49

DEPUTY CLERK OF COURT
ST. MARTIN PARISH

| Acquisition Date | Amount Paid | Check No./ Wire Transfer | Check / Wire Transfer Date | Seller | Represented Prospect Name/ Property Location |
|---|---|---|---|---|---|
| | $94,000.00 | 1017 | 7/29/2011 | Pinnacle | Beauregard Parish, Louisiana – no legal description provided |
| | $47,000.00 | 105 | 8/28/2011 | Pinnacle | Beauregard Parish, Louisiana – no legal description provided |
| | $143,000.00 | 110 | 9/19/2011 | Pinnacle | Beauregard Parish and Vernon Parish, Louisiana |
| | $137,000.00 | 111 | 9/25/2011 | Pinnacle | Jefferson County, Texas |
| | $141,500.00 | 117 | 1/17/2012 | Pinnacle | Eagle Ford Shale |
| 7/22/2008 | $9,100.00 | 1664 | 7/21/2008 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T14N-R14W, Section 30 |
| 7/22/2008 | " " | 1664 | 7/21/2008 | Pinnacle | Haynesville Prospect, Bossier Parish, Louisiana, T17N-R11W, Section 9 |
| 8/8/2008 | $42,375.00 | 1669 | 8/7/2008 | Pinnacle | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R16W, Section 32; T16N-R15W, Section 6 |
| 8/8/2008 | " " | 1669 | 8/7/2008 | Pinnacle | Haynesville Prospect and Jurassic Prospect, Desoto Parish, Louisiana, T16N-R14W, Section 36; T11N-R13W, Section 25 |
| 8/14/2008 | " " | 1669 | 8/7/2008 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T13N-R13W, Sections 18, 20 |
| 9/23/2008 | $56,000.00 | 1679 | 9/18/2008 | Pinnacle | Haynesville Prospect, Webster Parish, Louisiana, T17N-R9W, Section 33; T18N-R10W, Section 23; T17N-R10W, Section 17 |
| 10/15/2008 | $90,100.00 | 1692 | 10/14/2008 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T13N-R10W, Section 21; T13N-R9W, Section 35; T13N-R9W, Section 35 |

2

| Acquisition Date | Amount Paid | Check No./ Wire Number | Check / Wire Date / Date of Date | Seller | Represented Prospect Name / Property Location |
|---|---|---|---|---|---|
| 10/15/2008 | " " | 1692 | 10/14/2008 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T16N-R14W, Section 36; T11N-R13W, Section 25 |
| 10/15/2008 | " " | 1692 | 10/14/2008 | Pinnacle | Haynesville Prospect and Cotton Valley Prospect, Desoto Parish, Louisiana, T12N-R16W, Section 11 |
| 10/15/2008 | " " | 1692 | 10/14/2008 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T12N-R8W, Section 29; T14N-R9W, Section 20 |
| 10/20/2008 | " " | 1692 | 10/14/2008 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T14N-R9W, Sections 12, 26 |
| 10/27/2008 | $5,000.00 | 1694 | 10/19/2008 | Pinnacle | Haynesville Prospect, Lafourche Parish, Louisiana, T19S-R21E, Section 24 |
| 11/4/2008 | $11,600.00 | 1702 | 11/3/2008 | Pinnacle | Haynesville Prospect, Sabine Parish, Louisiana, T9N-R11W, Section 29 |
| 11/24/2008 | $34,800.00 | 1705 | 11/19/2008 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T13N-R10W, Section 22 |
| 11/24/2008 | " " | 1705 | 11/19/2008 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T14N-R9W, Section 20 |
| 11/24/2008 | " " | 1705 | 11/19/2008 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T13N-R8W, Section 29 |
| 12/8/2008 | $12,666.67 | 1710 | 12/5/2008 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T11N-R15W, Section 22; T12N-R13W, Section 30 |
| 1/7/2009 | $17,000.00 | 1712 | 12/18/2008 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T15N-R14W, Section 1 |
| 1/7/2009 | $18,000.00 | 1724 | 1/9/2009 | Pinnacle | Haynesville Prospect, Caddo Parish, Louisiana, T16N-R14W, Section 21 |
| 2/12/2009 | $43,500.00 | 1727 | 1/27/2009 | Pinnacle | Haynesville Prospect in Bossier Parish, Louisiana, T17N-R11W, Section 4 |

| Acquisition Date | Amount Paid | Check No./Wire Transfer | Check/Wire Transfer Date | Seller | Represented/Registered Name/Property Location |
|---|---|---|---|---|---|
| 3/18/2009 | $25,200.00 | 1738 | 3/6/2009 | Pinnacle | Edgerly Prospect, Calcasieu Parish, Louisiana, T9S-R12W, Section 11 |
| 3/18/2009 | $22,500.00 | 1743 | 3/23/2009 | Pinnacle | Edgerly Prospect, Calcasieu Parish, Louisiana, T9S-R12W, Section 11 |
| 4/9/2009 | $27,000.00 | 1747 | 4/5/2009 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T12N-R13W, Section 29 |
| 4/23/2009 | $18,800.00 | 1006 | 4/18/2009 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T12N-R13W, Sections 28, 33, 34 |
| 5/12/2009 | $18,800.00 | 1007 | 5/9/2009 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T14N-R13W, Section 29 |
| 6/5/2009 | $72,000.00 | 108 | 6/18/2009 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T13N-R13W, Section 4 |
| 6/29/2009 | " " | 108 | 6/18/2009 | Pinnacle | Haynesville Prospect, Caddo Parish, Louisiana, T16N-R16W, Sections 26, 35, 36 |
| 8/1/2009 | $28,500.00 | 1009 | 5/21/2009 | Pinnacle | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R16W, Section 12 |
| 10/25/2009 | $59,450.00 | 106 | 11/10/2009 | Pinnacle | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R15W, Sections 17, 18 |
| 10/25/2009 | " " | 106 | 11/10/2009 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T13N-R12W, Section 29 |
| 11/17/2009 | $106,000.00 | 107 | 11/24/2009 | Pinnacle | Haynesville Prospect, Red River Parish, Louisiana, T13N-R9W, Section 24 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Pinnacle | Haynesville Prospect in Caddo Parish, Louisiana, T15N-R16W, Section 1 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Pinnacle | Haynesville Prospect, Bienville Parish, Louisiana, T16N-R9W, Section 28 |
| 11/17/2009 | " " | 107 | 11/24/2009 | Pinnacle | Haynesville Prospect in Caddo Parish, Louisiana, T16N-R15W, Sections 35 and 36 |

4

| Acquisition Date | Amount Paid | Credit No./ Wire Transfer | Credit/Wire Transfer Date | Seller | Represented Prospect Name/ Property Location |
|---|---|---|---|---|---|
| 11/17/2009 | " " | 107 | 11/24/2009 | Pinnacle | Haynesville Prospect in Caddo Parish, Louisiana, T16N-R15W, Section 7 |
| 3/10/2010 | $78,200.00 | 102 | 3/16/2010 | Pinnacle | Haynesville Prospect, Sabine Parish, Louisiana, T9N-R13W, Section 13; T9N-R11W, Section 3 |
| 4/28/2010 6/3/2010 3/2/2011 | $249,999.00 | Wire transfer from Centennial Bank | 11/25/2009 | Pinnacle | Bakken Prospect, Roosevelt County, Montana, T29N-R49E, T28N-R50E, T29N-R50E, T27N-51E, T28N-51E with multiple sections in each Township-Range |
| 5/20/2011 | $24,000.00 | 133 | 6/1/2011 | Pinnacle | Haynesville Prospect in Red River Parish, Louisiana, T12N-R10W, Section 35 |
| 7/1/2010 | $65,000.00 | 100 | 7/29/2010 | Pinnacle | Haynesville Prospect in Desoto Parish, Louisiana, T14N-R15W, Section 35 |
| 7/19/2010 | $63,000.00 $139,500.00 $283,500.00 | 101 103 1004 | 6/10/2010 6/29/2010 7/13/2010 | Pinnacle | Anadarko / Austin Chalk Prospect, Vernon Parish, Louisiana, T1S-R11W, Sections 31, 32; T2S-R11W, Sections 8, 23 |
| 8/19/2010 | $84,600.00 | 1002 | 8/14/2010 | Pinnacle | South Perry Prospect, Vermilion Parish, Louisiana, T13S-R3E, Section 15 |
| 9/23/2010 | $127,500.00 | 1004 | 9/23/2010 | Pinnacle | Haynesville Prospect in Red River Parish, Louisiana, T12N-9W, Section 22 |
| 9/29/2010 | " " | 1004 | 9/23/2010 | Pinnacle | Haynesville Prospect in Sabine Parish, Louisiana, T9N-R13W, Section 24 |
| 11/8/2010 | $52,000.00 | 102 | 11/9/2010 | Pinnacle | Caddo Parish, T1SN-R15W, Section 7 |
| 11/8/2010 | " " | 102 | 11/9/2010 | Pinnacle | Haynesville Prospect in Desoto Parish, Louisiana, T11N-R13W, Section 14. |
| 11/12/2010 | $30,000.00 | 1006 | 11/18/2010 | Pinnacle | Opelousas Prospect, St. Landry Parish, Louisiana, T6S-R4E, Sections 116, 117 |
| 11/15/2010 | $216,000.00 | 96 | 10/25/2010 | Pinnacle | Austin Chalk Prospect, Vernon Parish, Louisiana, T2S-R11W, Sections 2, 12 |

5

| Acquisition Date | Amount Paid | Check No./Wire Transfer | Check/Wire Transfer Date | Seller | Represented Prospect Name/Property Description |
|---|---|---|---|---|---|
| 11/23/2010 | $24,000.00 | 101 | 3/11/2011 | Pinnacle | Erath Prospect, Vermilion Parish, Louisiana, T13S-R4E, Sections 32, 33 |
| 2/1/2011 | $91,000.00 | 101 | 9/8/2010 | Pinnacle | Niobrara Shale, Laramie County, Wyoming; Weld County, Colorado; T10N-R60W; T9N-R62W; T15N-R62W; T13N-R63W; T14N-R63W; T11N-R64W; T19N-R66W - multiple sections in the above |
| 3/8/2011 | $210,000.00 | 107 | 12/10/2010 | Pinnacle | Samson Lonestar, Galveston County, Texas |
| 3/16/2011 | $21,075.00 | 1005 | 3/11/2011 | Pinnacle | Leleux Prospect, Vermilion Parish, Louisiana, T11S-R1E, Section 33 |
| 3/16/2011 | " " | 1005 | 3/11/2011 | Pinnacle | Houma Prospect, Terrebonne Parish, Louisiana, T17S-R18E, Section 26 |
| 3/16/2011 | $43,400.00 | 1004 | 2/2/2011 | Pinnacle | Lawtell Prospect, St. Landry Parish, Louisiana, T6S-R3E, Sections 21, 28, 29 |
| 3/28/2011 | $27,500.00 | 112 | 1/17/2012 | Pinnacle | Cordillera Energy Prospect, Roger Mills County, Oklahoma, T15N-R22W, Section 2 |
| 4/1/2011 | $31,500.00 | 129 | 4/27/2011 | Pinnacle | Haynesville Prospect in Caddo Parish, Louisiana, T15N-R15W, Sections 10, 11 |
| 4/15/2011 | $60,000.00 | 102 | 3/29/2011 | Pinnacle | Tonkawa Prospect, Roger Mills County, Oklahoma, T16N-R22W, Section 31 |
| 4/15/2011 | " " | 102 | 3/29/2011 | Pinnacle | Tonkawa Prospect, Roger Mills County, Oklahoma, T16N-R22W, Section 34 |
| 4/19/2011 | $12,950.00 | 1013 | 4/15/2011 | Pinnacle | South Harmony Church Prospect, Allen Parish, Louisiana, T6S-R5W, Section 12 |
| 5/2/2011 | $71,400.00 | 128 | 4/27/2011 | Pinnacle | Chesapeake Tonkawa Prospect, Roger Mills County, Oklahoma, T16N-R22W, Section 23 |

6

| Acquisition Date | Amount Paid | Check No./Wire Transfer | Check/Wire Transfer Date | Seller | Represented Prospect Name / Property Location |
|---|---|---|---|---|---|
| 5/25/2011 | $84,100.00 | 132 | 6/1/2011 | Pinnacle | South Harmony Church Prospect, Allen Parish, Louisiana, T6S-R5W, Section 13 |
| 6/1/2011 | " " | 132 | 6/1/2011 | Pinnacle | S. Harmony Church IV Prospect, Allen Parish, Louisiana, T6S-R5W, Section 15 |
| 5/25/2011 | $12,000.00 | 103 | 6/1/2011 | Pinnacle | Port Hudson Prospect, East Baton Rouge Parish, Louisiana, T5S-R1W, Section 72 |
| 8/25/2011 | $75,200.00 | 101 | 7/10/2011 | Pinnacle | West Edgerly Prospect, Calcasieu Parish, Louisiana, T9S-R12W, Section 26 |
| 8/25/2011 | $125,000.00 | 104 | 8/28/2011 | Pinnacle | West Pilgrim Church Prospect, Allen Parish, Louisiana, T5S-R5W, Sections 26, 35 |
| 9/1/2011 | $63,000.00 | 106 | 8/28/2011 | Pinnacle | Pinewood Prospect, Vernon Parish, Louisiana, T1S-R9W, Sections 18, 21, 22 |
| 1/1/2012 | $93,500.00 | 112 | 1/17/2012 | Pinnacle | Haynesville Prospect, Desoto Parish, Louisiana, T15N-R14W, Section 16; T15N-R14W, Section 16 |
| 1/1/2012 | " " | 112 | 1/17/2012 | Pinnacle | Tiger Lagoon Prospect, Vermilion Parish, Louisiana, T13S-R4E, Sections 25, 36; T13S-R4E, Sections 25, 36; T13S-R4E, Section 36 |
| 2/6/2012 | " " | 112 | 1/17/2012 | Pinnacle | Haynesville Prospect, Caddo Parish, Louisiana, T15N-R15W, Section 8 |
| 2/13/2012 | $141,000.00 | 115 | 2/13/2012 | Pinnacle | Lake Rosemound and Bayou Sara Prospect in West Feliciana Parish, Louisiana – T1S-R3W, Section 41; T1S-R2W, Sections 76, 82, 83 |
| 2/28/2012 | " " | 115 | 2/13/2012 | Pinnacle | West Obelin Prospect in Allen Parish, Louisiana – T5S-R4W, Section 20 |

| Acquisition Date | Amount Paid | Check No./ Wire Transfer | Check /Wire Transfer Date | Seller | Represented Prospect Name/Property Location |
|---|---|---|---|---|---|
| 3/19/2012 | $60,000.00 | 115 | 3/15/2012 | Pinnacle | Tuscaloosa Marine Shale in West Feliciana Parish, Louisiana - T1S-R3W, Section 41; T1S-R2W, Sections 76, 82, 83 |
| 3/29/2012 | $124,000.00 | 116 | 3/24/2012 | Lemel | NW Wilmer Prospect in Tangipahoa Parish, Louisiana – T2S-R7E, Section 34 |
| | $60,000.00 | 118 | 5/3/2012 | Lemel | Encana Lease in Wilkinson County, Mississippi - T1N-R1W, Sections 3, 4, 15 |
| 5/29/2012 | $64,000.00 | 117 | 5/21/2012 | Lemel | TMS Mineral Acquisition in St. Helena Parish, Louisiana – T1S-R6E, Sections 16, 22, 42 |
| 5/29/2012 | $64,000.00 | 118 | 5/28/2012 | Lemel | TMS Mineral Acquisition in St. Helena Parish, Louisiana – T1S-R6E, Section 42 |
| $5,843,725.60 | | | | | |

US\W 803869092.2

## EXHIBIT "B"

## INTERESTS PURCHASED BY SCHAFFER FAMILY INVESTORS

| Acquisition Date | Amount Paid | Check No. | Check Date | Seller | Represented Prospect Name/Property Location |
|---|---|---|---|---|---|
| 2/13/2012 | $300,000.00 | 702 | 5/7/2012 | Lemel | Encana Lease in Wilkinson County, Mississippi – T1N-R1W, Sections 3, 4, 15 |
| 2/13/2012 | $615,000.00 | 664 | 2/13/2012 | Pinnacle | Lake Rosemound and Bayou Sara Prospect in West Feliciana Parish, Louisiana – T1S-R3W, Section 41; T1S-R2W, Sections 76, 82, 83 |
| 2/28/2012 | " " | 664 | 2/13/2012 | Pinnacle | West Oberlin Prospect in Allen Parish, Louisiana – T5S-R4W, Section 20 |
| 3/19/2012 | $240,000.00 | 669 | 3/20/2012 | Pinnacle | Tuscaloosa Marine Shale in West Feliciana Parish, Louisiana – T1S-R3W, Section 41; T1S-R2W, Sections 76, 82, 83 |
| 3/29/2012 | $496,000.00 | 671 | 3/29/2012 | Lemel | NW Wilmer Prospect in Tangipahoa Parish, Louisiana – T2S-R7E, Section 34 |
| 5/29/2012 | $256,000.00 | 706 | 5/22/2012 | Lemel | TMS Mineral Acquisition in St. Helena Parish, Louisiana – T1S-R6E, Sections 16, 22, 42 |
| 8/23/2012 | $194,400.00 | 738 | 8/13/2012 | Lemel | Haynesville Prospect in Red River Parish, Louisiana – T13N-R11W, Section 4 |
| 8/23/2012 | " " | 738 | 8/13/2012 | Lemel | TMS Prospect in Amite County, Mississippi – T1N-R5E, Section 15, 21, 22 |
| TOTAL | $2,101,400.00 | | | | |

USW 80380984 62

## CITATION

| | |
|---|---|
| *SCHAFFER FAMILY INVESTORS LLC - ET AL* <br><br> *Versus* <br><br> *THE ESTATE OF KRIS MELANCON - ET AL* | **Case: 082242** <br> **Division: F** <br> **16ᵗʰ Judicial District Court** <br> **Parish of St. Martin** <br> **State of Louisiana** |



*TO:*
  *LEMEL PETROLEUM, LLC*
  *THROUGH ITS REGISTERED AGENT:*
  *PARKER YELVERTON*
  *247 ROSEMARY PLACE*
  *LAFAYETTE, LA 70508*

          *of LAFAYETTE Parish, Louisiana.*

    *You are hereby summoned to comply with the demand contained in the PETITION FOR DAMAGES of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, in the 16th Judicial District Court in and for the Parish of St. Martin, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.*

    *WITNESS MY OFFICIAL HAND AND SEAL OF OFFICE AT ST. MARTINVILLE, LOUISIANA, on this 13TH day of FEBRUARY, 2015.*

                                    *BECKY P. PATIN*
                                      *Clerk of the 16ᵗʰ Judicial District Court for*
                                      *St. Martin Parish, Louisiana*

                                      *BY:* _____
                                                *Deputy Clerk of Court*

*REQUESTED BY:*
*BRIAN M. BALLAY*
*ATTORNEY FOR: SCHAFFER FAMILY INVESTORS, LLC, ET AL*

---

### Service Information

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20____.

Service    $_____

Mileage    $_____      By: _____
                                         *Deputy Sheriff*

Total    $_____

[ RETURN ]

## CITATION



| | | |
|---|---|---|
| **SCHAFFER FAMILY INVESTORS LLC - ET AL** | | **Case: 082242** |
| | | **Division: F** |
| *Versus* | | **16th Judicial District Court** |
| | | **Parish of St. Martin** |
| **THE ESTATE OF KRIS MELANCON - ET AL** | | **State of Louisiana** |

TO:
   THE ESTATE OF KRIS MELANCON
   THROUGH ITS ADMINISTRATOR:
   PARKER YELVERTON
   247 ROSEMARY PLACE
   LAFAYETTE, LA 70508

            of LAFAYETTE Parish, Louisiana.

        You are hereby summoned to comply with the demand contained in the *PETITION FOR DAMAGES*

of which a true and correct copy (exclusive of exhibits) accompanies this citation,  or make an appearance,

either by filing a pleading or otherwise,  in the 16th Judicial District Court in and for the Parish of St. Martin,

State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.


     WITNESS MY OFFICIAL HAND AND SEAL OF OFFICE AT ST. MARTINVILLE, LOUISIANA, on this
13TH day of FEBRUARY, 2015.


                              BECKY P. PATIN
                              Clerk of the 16th Judicial District Court for
                              St. Martin Parish, Louisiana

                              BY: _____
                                                Deputy Clerk of Court

REQUESTED BY:
BRIAN M. BALLAY
ATTORNEY FOR: SCHAFFER FAMILY INVESTORS, LLC, ET AL

### Service Information

Received on the _____ day of _____, 20_____ and on the _____ day of
_____, 20_____ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the
hands of _____, a person apparently over the age of seventeen
years, living and residing in said domicile and whose name and other facts connected with this service, I
learned by interrogating the said person, said party herein being absent from his/her residence at the time of
said service.

Returned:
Parish of _____ this _____ day of _____, 20_____

Service     $_____

Mileage    $_____          By: _____
                                              Deputy Sheriff

Total       $_____


                        [ RETURN ]

## CITATION

| | | |
|---|---|---|
| SCHAFFER FAMILY INVESTORS LLC - ET AL | | Case: 082242 |
| | | Division: F |
| Versus |  | 16th Judicial District Court |
| | | Parish of St. Martin |
| THE ESTATE OF KRIS MELANCON - ET AL | | State of Louisiana |

TO:
 PARKER YELVERTON
 247 ROSEMARY PLACE
 LAFAYETTE, LA 70508

of LAFAYETTE Parish, Louisiana.

You are hereby summoned to comply with the demand contained in the PETITION FOR DAMAGES of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, in the 16th Judicial District Court in and for the Parish of St. Martin, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

WITNESS MY OFFICIAL HAND AND SEAL OF OFFICE AT ST. MARTINVILLE, LOUISIANA, on this 13TH day of FEBRUARY, 2015.

BECKY P. PATIN
Clerk of the 16th Judicial District Court for
St. Martin Parish, Louisiana

BY:_____
                                Deputy Clerk of Court

REQUESTED BY:
BRIAN M. BALLAY
ATTORNEY FOR: SCHAFFER FAMILY INVESTORS, LLC, ET AL

---

### Service Information

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:

Personal Service on the party herein named _____.
Domiciliary Service on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20_____.

Service    $_____
                                        By: _____
Mileage    $_____                          Deputy Sheriff

Total      $_____

[ RETURN ]

## CITATION

| | | |
|---|---|---|
| *SCHAFFER FAMILY INVESTORS LLC - ET AL* |  | **Case:** 082242 |
| *Versus* | | **Division:** F |
| | | 16th Judicial District Court |
| *THE ESTATE OF KRIS MELANCON - ET AL* | | Parish of St. Martin |
| | | State of Louisiana |

*TO:*
   *PINNACLE OIL AND GAS, LLC*
   *THROUGH ITS REGISTERED AGENT:*
   *PARKER YELVERTON*
   *247 ROSEMARY PLACE*
   *LAFAYETTE, LA 70508*

of *LAFAYETTE Parish, Louisiana.*

You are hereby summoned to comply with the demand contained in the *PETITION FOR DAMAGES* of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, in the 16th Judicial District Court in and for the Parish of St. Martin, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

WITNESS MY OFFICIAL HAND AND SEAL OF OFFICE AT ST. MARTINVILLE, LOUISIANA, on this 13TH day of FEBRUARY, 2015.

BECKY P. PATIN
Clerk of the 16th Judicial District Court for
St. Martin Parish, Louisiana

BY: _____
                          Deputy Clerk of Court

REQUESTED BY:
BRIAN M. BALLAY
ATTORNEY FOR: SCHAFFER FAMILY INVESTORS, LLC, ET AL

### Service Information

Received on the _____ day of _____, 20____ and on the ___19ᵗʰ___ day of _February_, 20_15_ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of seventeen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20_____.

Service    $_____
                          By: _____
Mileage    $_____                    Deputy Sheriff

Total    $_____

[ RETURN ]